IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


RUBY K WOODS                                                        PLAINTIFF


        v.                              CIVIL NO. 07-5194


MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                     DEFENDANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act).

**I.      Procedural Background:**

The application for DIB presently before this court was filed on April 16, 2002, alleging an inability to work since August 7, 2001, due to fibromyalgia, degenerative joint disease, back surgery, high blood pressure and hypothyroidism. (Tr. 51-53, 67). An administrative hearing was held on May 27, 2003. (Tr. 230-253).  Plaintiff was present and represented by counsel.

 In a written decision dated July 29, 2003, the ALJ determined plaintiff retained the residual functional capacity (RFC) to perform a full range of sedentary work. (Tr.11-19). The Appeals Council declined review of the ALJ's decision on October 1, 2003. (Tr. 3-6).

Plaintiff appealed this decision in federal district court. Defendant filed a motion to remand plaintiff's case on March 1, 2004. (Tr. 281).  In a decision dated March 9, 2004, this

court granted defendant's motion to remand. (Tr. 280). The Appeals Council vacated the ALJ's decision and remanded plaintiff's case back to the ALJ on May 20, 2004. (Tr. 285-286).   A supplemental hearing was held on April 7, 2005. (Tr. 369-384).   Plaintiff was present and represented by counsel.

By written decision dated September 13, 2005, the ALJ found that plaintiff has an impairment or combination of impairments that are severe.  (Tr. 267-277).  However, after reviewing all of the evidence presented, he determined that plaintiff's impairments do not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 276). The ALJ found plaintiff retained the residual functional capacity (RFC) to engage in occasional lifting of twenty pounds and frequent lifting of ten pounds, standing/walking for two hours and sitting for six hours, with no stooping or crouching. (Tr. 276). With regard to nonexertional impairments, the ALJ found plaintiff was limited to only that work not precluded by the following: a more than satisfactory ability to function independently, understand, remember and carry out simple instructions and maintain personal appearance; a limited but satisfactory ability to follow work rules, use judgment, maintain attention and concentration, and understand, remember and carry out both detailed and complex instructions; a between limited but satisfactory and seriously limited but not precluded ability to relate to co-workers, deal with the public, interact with supervisors, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability; and with a seriously limited but not precluded ability to deal with work stresses. (Tr. 276).  With the help of a vocational expert, the ALJ found plaintiff could perform other unskilled sedentary work as a production worker, a call out operator and a charge account clerk. (Tr. 315).

-2-

Plaintiff appealed the decision of the ALJ to the Appeals Council. The Appeals Council denied plaintiff's request for review on September 7, 2007. (Tr.254-256). When the Appeals Council declined review, the ALJ's decision became the final action of the Commissioner. Plaintiff now seeks judicial review of that decision. (Doc. No. 1). Both parties filed appeal briefs and this case is before the undersigned for report and recommendation. (Doc. No. 7,8).

## II.   <u>Evidence Presented:</u>

A supplemental administrative hearing was held on April 7, 2005, at which plaintiff, represented by counsel, and plaintiff's husband appeared and testified. (Tr. 369-384).

The pertinent medical evidence in this case reflects the following.  Prior to the alleged onset date plaintiff had sought treatment for lower back and left leg pain resulting from an on-the-job injury in October of 2000. (Tr. 105-118, 129-139, 146-157).

Plaintiff underwent a MRI of the lumbar spine on July 20, 2001, that revealed an L2-3 broad based disc bulge with superimposed left lateral disc protrusion that appeared to at least abut exiting L2 nerve root just lateral to the neural foramin, an L3-4 broad based disc bulge with superimposed left lateral disc protrusion with no evidence of nerve root impingement; a broad based disc bulge at L4-5 and L5-S1 with no evidence of nerve root impingement; no spinal canal stenosis; and disc desiccation from L2-3 through L5-S1 with no evidence of significant height loss. (Tr. 130-131).

Progress notes dated July 24, 2001, report plaintiff's complaints of right posterior lateral leg pain. (Tr. 129).  Dr. James B. Blankenship recommended plaintiff undergo a lateral recess decompression at L4-5 on the right.

Plaintiff underwent a decompressive hemilaminotomy on the right at L4-5 on August 7, 2001. (Tr. 126).

Progress notes dated August 31, 2001, report plaintiff's complaint of a headache and aching pain in her knees down to her ankles. (Tr. 144). Plaintiff denied any numbness, tingling or weakness. Dr. Timothy Yawn diagnosed plaintiff with a headache, fibromyalgia and hypertension. Plaintiff was to use moist heat every day and she was given samples of Celebrex. Plaintiff was also taking Amitriptyline.

On September 7, 2001, plaintiff underwent a MRI of the lumbar spine that revealed postoperative changes appear on the right at the L4-5 level. (Tr. 124-125).

Progress notes dated September 11, 2001, report a MRI showed a complete decompression of the right L5 nerve root. (Tr. 123). Dr. Blankenship noted plaintiff reported having right posterolateral leg pain preoperatively and plaintiff reported no change in her leg pain after her surgery. Dr. Blankenship noted the MRI demonstrated decompression and significant compression of the nerve roots on either side. Plaintiff was diagnosed with postlaminectomy syndrome. Dr. Blankenship placed plaintiff on Neurontin and had plaintiff evaluated for some exercise therapy. Dr. Blankenship was uncertain if plaintiff could return to work if her activities could not be limited.

During a follow-up call with Dr. Blankenship on September 13, 2001, plaintiff reported left-sided leg pain and the new onset of groin pain on the left-hand side. (Tr. 122). Dr. Blankenship assured plaintiff that it was a little early for the Neurontin to be working. Dr. Blankenship refilled plaintiff's Celebrex prescription for another month. Dr. Blankenship noted

-4-

if plaintiff did not significantly improve over the next week he would recommend a bone scan and possibly a pelvic CT.

In a letter dated September 18, 2001, Dr. Blankenship stated plaintiff underwent a microdecompression but continued to have significant left leg pain. (Tr. 121). Dr. Blankenship stated he advised plaintiff to undergo a bone scan and a MRI of her pelvis. Dr. Blankenship indicated these procedures were an absolute medical necessity.

Progress notes dated September 25, 2001, report plaintiff's complaint of left lower extremity pain. (Tr. 120). Plaintiff reported she was no better than she was a week before. Dr. Blankenship noted trouble getting a pelvic MRI and bone scan approved and opined that the bone scan was not a necessity. Dr. Blankenship diagnosed plaintiff with persistent left lower extremity pain and status-post bilateral decompression from a right gutter approach with good decompression. Dr. Blankenship recommended plaintiff undergo a pelvic MRI and a lumbar myelogram.

Progress notes dated September 26, 2001, report plaintiff wanted to start taking Meridia again. (Tr. 142). Plaintiff reported she was walking on the treadmill for about twenty minutes a day until her legs started hurting. Plaintiff reported she was sleeping well and denied any heart palpitations. Dr. Yawn diagnosed plaintiff with hypothyroidism, hypertension and obesity. Plaintiff was to stay on a 1500 calorie diet, continue her medication and monitor her blood pressure regularly.

Progress notes dated October 9, 2001, report plaintiff's persistent left lower extremity pain was still fairly unrelenting. (Tr. 119). Dr. Blankenship noted plaintiff's pelvic MRI revealed a cyst on her right ovary and recommended plaintiff see her gynecologist for further evaluation.

-5-

Dr. Blankenship noted plaintiff reported she had set up an appointment with a physician in Tulsa for further evaluation. Dr. Blankenship noted he would be interested in what that physician said and that he might recommend plaintiff see Dr. Wayne Brooks.

In a letter dated October 26, 2001, Dr. Anthony C. Billings stated he examined plaintiff so that he could issue and opinion. (Tr. 186).  Dr. Billings noted plaintiff underwent a right-sided decompression. Dr. Billings opined that procedure would not have helped plaintiff's left-sided pain and that he did not see any indication of left-sided surgery in August of 2001. Dr. Billings opined plaintiff had not been properly diagnosed.

After examining a lumber MRI and CT scan dated November 30, 2001, and physically examining plaintiff on the same date, Dr. Billings, in a letter dated December 11, 2001, opined plaintiff did not have a surgically treatable injury. (Tr. 182-184).  Dr. Billings found the MRI and CT demonstrated normal disk configuration and did not show evidence of nerve root compression. Dr. Billings recommended continued treatment with analgesics and observation. Dr. Billings prescribed Lortab and Soma and said he would see plaintiff back in six months.

In a letter dated January 8, 2002, Dr. Billings recommended plaintiff make an appointment with the Texas Spine Institute in Plano, Texas. (Tr. 177).

Progress notes dated January 17, 2002, report plaintiff came in for a hypertension follow-up. (Tr. 140).  Dr. Yawn noted plaintiff had not been monitoring her blood pressure on a regular basis and denied chest pain and shortness of breath, headaches, dizziness or vision problems. Dr. Yawn noted plaintiff's anxiety. Plaintiff requested to be placed on Meridia. Plaintiff was diagnosed with hypertension and obesity. Dr. Yawn noted no clubbing, cyanosis or edema and good peripheral pulses in plaintiff's bones, joints and extremities. Dr. Yawn instructed plaintiff

AO72A
(Rev. 8/82)

to maintain a 1500 calorie a day diet and to continue her current medication. Plaintiff was also started on Meridia. Plaintiff was to return for a follow-up appointment in one month or sooner if problems developed.

In a letter dated March 21, 2002, Dr. R. David Cannon stated plaintiff continued to be plagued with left hip and buttock pain and left lower extremity pain. (Tr. 173-174). Dr. Cannon, after examining plaintiff (Tr. 170-172), noted her pain to be originating from the left SI joint. Because plaintiff had tenderness over the left SI joint with a positive Patrick's sign, Dr. Cannon recommended a left SI joint injection. Dr. Cannon noted other options could be a TENS trial or an epidural injection. Dr. Cannon opined that if the injections and TENS trial were ineffective plaintiff was most likely at maximum medical improvement. Dr. Cannon noted that obtaining a FCE might be beneficial if plaintiff was to return to work. Dr. Cannon opined work restrictions would be hard to list but he would suggest using the guidelines from Drs. Blankenship or Billings.

On March 27, 2002, plaintiff underwent a left SI joint injection given by Dr. Cannon. (Tr. 167-169).

On April 26, 2002, plaintiff underwent a SPECT bone scan of her lumbosacral spine. (Tr. 164). Dr. Doron D. Ben-Avi opined plaintiff's scan revealed increased uptake in the left side of the L4 vertebral body and the vicinity of the right L4-5 facet joint of uncertain etiology. Dr. Ben-Avi recommended a plain film correlation and indicated he would compare this to any old studies if the older studies were provided to him.

On May 20, 2002, plaintiff underwent right and left side L4-L5 injections given by Dr. Cannon. (Tr. 160-161).

-7-

In a letter dated June 3, 2002, Dr. Cannon stated after reviewing plaintiff's bone scan results showing increased inflammation around the facet joints at the L4-5 level, plaintiff underwent bilateral facet injections that provided no improvement. (Tr. 158). Dr. Cannon stated plaintiff had undergone SI joint and facet injections with no improvement and that he had no other options to treat her back pain. Dr. Cannon stated it had been almost two years since the date of her injury and opined plaintiff had reached maximum medical improvement. With regard to restrictions, Dr. Cannon stated he did not do disability impairment ratings and therefore could not recommend what activities plaintiff might be able to perform.

In progress notes dated June 21, 2002, Dr. Billings states there is nothing further that could or should be done to relieve plaintiff of her pain.(Tr. 176). He indicated he would be happy to see plaintiff for medical management in the future but did not think surgical treatment was indicated.

On July 3, 2002, Dr. Ronald M. Crow, a non-examining, medical consultant, completed a RFC assessment stating that plaintiff could perform light work with occasional stooping and crouching (Tr.198-207). The assessment was affirmed on October 3, 2002, by Dr. Alice Davidson. (Tr. 206).

Progress notes dated August 21, 2002, report plaintiff was in for a hypertension follow-up. (Tr. 217). Dr. Yawn noted plaintiff reported continuing to have a lot of pain in her lower back since her surgery. Plaintiff also reported right knee pain. Plaintiff reported bending was the most painful activity and that she felt unstable on steps. Upon examination, Dr. Yawn noted positive tenderness of the medial-anterior right knee region, mild medial joint space narrowing and no tenderness of the lateral right knee. Dr. Yawn noted plaintiff wanted to start Meridia

-8-

again because she was not able to work or exercise and had gained a lot of weight. After examining plaintiff, Dr. Yawn diagnosed plaintiff with hypertension, obesity and right knee bursitis.

Progress notes dated September 19, 2002, report plaintiff was in for a follow-up for her weight loss. (Tr. 215). Plaintiff had lost five pounds. Plaintiff also reported she had not been able to exercise since her back surgery. Plaintiff was diagnosed with obesity and instructed to continue her medications as prescribed.

Progress notes dated October 21, 2002, report plaintiff was in for a hypertension follow-up. (Tr. 213). Dr. Yawn noted plaintiff's report of lumbar back pain and left leg radiculopathy. Dr. Yawn noted plaintiff's report that she was not able to exercise due to her back injury. Plaintiff was diagnosed with hypertension and obesity and instructed to continue with her medications.

Progress notes dated December 23, 2002, report plaintiff was in for a follow-up for her hypothyroidism. (Tr. 210). Plaintiff reported she wanted to change her Elavil to something else because she was craving sweets. Dr. Yawn also talked to plaintiff about starting her on something to help her cope with her mom's terminal cancer illness. Plaintiff was diagnosed with hypothyroidism, insomnia and hypertension. Plaintiff was started on a thyroid stimulating hormone and her Amitriptyline was changed to Desyrel.

Progress notes dated February 17, 2003, report plaintiff's complaint of abdominal pain. (Tr. 208-209). Plaintiff reported she was still under a lot of stress due to her mother's illness and family problems. Dr. Yawn noted plaintiff was positive for tenderness in the lower parasternal region. Dr. Yawn diagnosed plaintiff with unspecified abdominal pain, depression and anxiety.

-9-

On June 2, 2003, Dr. Yawn completed a medical source statement. (Tr. 222-224).  Dr. Yawn opined plaintiff could lift and/or carry less than ten pounds; could stand and/or walk for a total of two hours during a  workday, fifteen minutes continuously; and could sit for a total of two hours during the workday, one hour continuously. Dr. Yawn opined plaintiff also had limitations with pushing and pulling. Dr. Yawn opined plaintiff could never climb, stoop, kneel, crouch, crawl but could occasionally balance. Dr. Yawn opined plaintiff had no limitations with handling, fingering, feeling, seeing or speaking but had a limited ability to reach. Dr. Yawn based this opinion on his examination of plaintiff, a MRI of plaintiff's lumbar spine and the patient's history. Dr. Yawn indicated this was an assessment for the period of August 2001 through June 2, 2003.

Plaintiff underwent a MRI of the lumbar spine on December 15, 2003. (Tr. 342, 338). Dr. John K. Hedgecock reported the study revealed a suspected right hemilaminectomy defect at L4-5 with minimal disc bulge seen not resulting in any significant central or lateral recess stenosis; minimal posterior disc bulge at L3-4 and L5-S1; and no abnormal enhancement to suggest discitis or vertebral osteomyelitis.

In a letter dated March 5, 2004, Dr. Yawn stated that his assessment of plaintiff dated June 2, 2003, was an accurate assessment of plaintiff's ability to perform activities. (Tr. 260). Dr. Yawn completed another letter opining the same limitations on April 6, 2005. (Tr. 329).

On April 1, 2004, plaintiff underwent a diagnostic interview at the Ozark Guidance Center (OGC). (Tr. 359). Plaintiff reported nightmares, grief over her mother's death, angry and hurt feelings, conflicts with three of her five sisters and chronic pain. Dr. Rest diagnosed plaintiff with an adjustment disorder with mixed anxiety and depressed mood and bereavement. Dr. Rest

-10-

gave plaintiff a global assessment of functioning (GAF) score of 49.  Dr. Rest recommended individual therapy.

Progress notes dated July 26, 2004, report plaintiff's complaint of chronic pain. (Tr. 334). Plaintiff reported she was out of some of her medications and was in a lot of pain. Dr. Yawn noted plaintiff was positive for mild tenderness of the left sacroiliac joint region. (Tr. 335).  Dr. Yawn diagnosed plaintiff with chronic pain syndrome, left leg radiculopathy, hypertension and obesity.  Dr. Yawn indicated he would start plaintiff on Topamax, increase Verelan and recommended plaintiff monitor her blood pressure.

On July 26, 2004, Dr. Yawn completed another medical source statement concurring with his previous assessments of plaintiff's capabilities but also adding environmental limitations. (Tr. 323).  This revised an assessment Dr. Yawn completed on July 19, 2004, indicating he had erred by indicating plaintiff was able to perform limited sedentary work. (Tr. 324, 333).

On September 14, 2004, plaintiff underwent a consultative orthopedic evaluation performed by Dr. Alice M. Martinson. (Tr. 325).  Plaintiff complained of constant low back pain with intermittent radiation down the left leg as far as the lateral left calf which was sometimes associated with numbness and tingling. Plaintiff reported her symptoms were made worse by sitting longer than one to two hours or standing or walking for forty-five minutes to an hour. Plaintiff also reported problems with bending. Plaintiff reported since she hurt her back she has had significant problems with anxiety and depression as well as abdominal pain. Dr. Martinson noted plaintiff's medications consisted of: Verapamil, Levothyroxine, Premarin, Clonazepam, Prilosec, Trazadone, Chlorthalidone, Hydrocodone, Skelaxin, Oxycontin, Topamax and Bextra. (Tr. 325). After examining plaintiff, reviewing interpretations of MRIs performed in 2000 and

-11-

2001, and reviewing x-rays taken in conjunction with the consultative exam (Tr. 327), Dr. Martinson opined plaintiff had mechanical low back complaints without objective evidence of radiculopathy. (Tr. 326). Dr. Martinson noted that several aspects of plaintiff's physical examination were non-physiologic and suggested symptom magnification. Dr. Martinson noted plaintiff also appeared to have significant psychological abnormalities and recommended a psychological evaluation.

Dr. Martinson also completed a medical assessment fo ability to perform work-related activities opining plaintiff could occasionally lift and/or carry twenty pounds, frequently ten pounds; could sit for six hours out of an eight-hour workday; and could stand and/or walk for two hours out of an eight-hour workday. (Tr. 328). Dr. Martinson further opined plaintiff could never stoop or crouch.

Progress notes dated October 26, 2004, report plaintiff was in for medication therapy for her back and leg pain and to report upper gastrointestinal pain. (Tr. 339). Plaintiff reported without medication her pain was a ten and with medication it was a four. Plaintiff reported her leg gave out occasionally. Upon examination, Dr. Yawn noted plaintiff was positive for tenderness in the mid-lower anterior chest wall and positive for tenderness of the bilateral lumbar paraspinous muscles. (Tr 340). Dr. Yawn diagnosed plaintiff with chronic pain syndrome, costochondritis and gastroesophageal reflux. Dr. Yawn increased plaintiff's Topamax, switched plaintiff's Prilosec to Aciphex and continued her other medications. Plaintiff was to return for a follow-up appointment in three months.

Progress notes dated January 5, 2005, report plaintiff was in for a medication change related to the cost of insurance. (Tr. 344). Plaintiff reported she needed to change her Skelaxin

-12-

prescription due to the increase in price. Plaintiff also requested medication for her depression. Plaintiff reported she had been depressed since Thanksgiving in 2004. Plaintiff reported she has crying spells, sadness, weakness, fatigue and lack of enjoyment. Dr. Yawn diagnosed plaintiff with depression, anxiety syndrome, fibromyalgia and chronic pain. Dr. Yawn recommended counseling, started plaintiff on Cymbalta and changed her Skelaxin prescription to Robaxin.

Progress notes dated February 2, 2005, report plaintiff's follow-up for depression. (Tr. 350). Plaintiff reported she felt the Cymbalta was working as she had not had as many crying spells. Dr. Yawn diagnosed plaintiff with depression, anxiety syndrome, menopausal syndrome and hypothyroidism. Dr. Yawn discussed counseling with plaintiff and instructed she continue taking her medication as prescribed.

On February 14, 2005, plaintiff underwent a diagnostic interview at the OGC. (Tr. 356). Plaintiff complained of shortness of breath, agoraphobia, conflicts with her sisters, anxious and depressed mood, insomnia, crying spells and poor concentration. Plaintiff reported experiencing violent dreams several months ago. Dr. Rest diagnosed plaintiff with Axis I - adjustment disorder with mixed anxiety and depressed mood and panic disorder with agoraphobia; Axis II - personality disorder NOS r/o w/ dependent features. Dr. Rest gave plaintiff a global assessment of functioning score of 45. Dr. Rest noted plaintiff would be followed in individual therapy. Plaintiff also acknowledged that she did not keep her appointments last year partly because she experienced a stigma coming to a mental health center.

Individual therapy notes dated February 22, 2005, report the objectives to be addressed were plaintiff's excessive anxiety and family problems. (Tr. 354). Dr. Rest noted plaintiff was still having difficulty regulating her emotions.

-13-

On April 29, 2005, plaintiff underwent a psychological evaluation performed by Dr. Scott McCarty. (Tr. 362-365).  Dr. McCarty noted plaintiff drove herself to the evaluation and presented neatly dressed with excellent grooming and hygiene. Dr. McCarty noted plaintiff dramatically averted her eye contact and often gazed downward. Dr. McCarty noted their were pain indications evident by repositioning, grimacing and having to stand up after prolonged sitting. Plaintiff disclosed health problems of back problems, high blood pressure and fibromyalgia. Dr. McCarty noted he questioned whether plaintiff was holding back on giving her best effort and motivation on the WAIS-III. Dr. McCarty opined plaintiff tried hard to demonstrate the severity of her reported symptoms and exhibited an exaggerated symptom presentation that appeared to earn secondary gains from her husband. Dr. McCarty noted plaintiff's Full Scale IQ score was a 70; however, Dr. McCarty opined plaintiff appeared to be more intellectually capable than her scores suggested. Dr. McCarty noted plaintiff exhibited impaired concentration on Digit Span, adequate persistence and dramatically slow pace. Dr. McCarty noted plaintiff's MMPI-2 results revealed an invalid profile that suggested pervasive lying and malingering. Dr. McCarty noted plaintiff's Beck Depression and Anxiety Inventories indicated severe depression and anxiety; however, he felt the results were dubious given her MMPI-2 results that suggested deception. Dr. McCarty diagnosed plaintiff with Axis I-malingering; and Axis II personality disorder NOS, strong cluster B features, borderline intellectual functioning.

Dr. McCarty also completed a medical assessment of ability to do work-related activities (mental). (Tr. 366).  With regard to making occupational adjustments, Dr. McCarty opined plaintiff had a very good/unlimited ability to function independently; a good ability to follow

-14-

work rules, use judgment and maintain attention and concentration; in between good and fair ability to relate to co-workers, deal with the public and interact with supervisors; and a fair ability to deal with work stresses. With regard to making performance adjustments, Dr. McCarty opined plaintiff had a good ability to understand, remember and carry out complex job instructions and to understand, remember and carry out detailed, but not complex, job instructions; and a very good/unlimited ability to understand, remember and carry out simple job instructions. (Tr. 367). With regard to making personal adjustments, Dr. McCarty opined plaintiff had a very good/unlimited ability to maintain personal appearance; and a good to fair ability to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability.

### III.    Applicable Law:

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the

-15-

evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience.  *See* 20 C.F.R. § 404.1520.  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity.  *See McCoy v. Schwieker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § 404.1520.

**IV.    Discussion:**

-16-

### A.        Subjective Complaints and Credibility Analysis:

We now address the ALJ's assessment of plaintiff's subjective complaints during the time period in question.  In disability determinations, credibility assessments are the province of the ALJ.  *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir. 1992).  This court will not substitute its judgment for that of the trier of fact, *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996), nor will we disturb the decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*.  As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  *Edwards v. Barnhart,* 314 F.3d 964, 966 (8th Cir. 2003).  We believe the ALJ adequately evaluated the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), and conclude there is substantial evidence supporting the ALJ's determination that plaintiff's complaints were not fully credible.

The record reflects plaintiff has sought treatment for back and lower left extremity pain during the relevant time period. The medical evidence reflects plaintiff underwent a decompressive hemilaminotomy in August of 2001.  Plaintiff continued to complain of left leg pain and underwent evaluations by Dr. Cannon and Dr. Billings.  In 2002, Dr. Billings indicated nothing further could or should be done to plaintiff's back and that plaintiff's pain would need to be addressed with medication management. The most recent MRI of plaintiff's lumbar spine dated December 2003, revealed a suspected right hemilaminectomy defect at L4-5 with minimal

-17-

AO72A
(Rev. 8/82)

disc bulge seen not resulting in any significant central or lateral recess stenosis; minimal posterior disc bulge at L3-4 and L5-S1; and no abnormal enhancement to suggest discitis or vertebral osteomyelitis. The record reflects plaintiff has continued to be prescribed pain medication by Dr. Yawn.  In October of 2004, plaintiff reported that without her medication her pain was a ten but with her medication her pain was a four. While plaintiff may indeed experience some degree of pain due to her back impairment, we find substantial evidence of record supporting the ALJ's finding that plaintiff does not have a disabling impairment. *See Lawrence v. Chater*, 107 F.3d 674, 676 (8th Cir. 1997) (upholding ALJ's determination that claimant was not disabled even though she had in fact sustained a back injury and suffered some degree of pain). Furthermore, the ALJ opined that had plaintiff experienced persistent pain as severe as alleged she would have sought treatment from her treating physician on a more regular basis. A review of the record reveals plaintiff saw Dr. Yawn once in 2003, twice in 2004, and twice in 2005.

Plaintiff alleged she experienced negative side effects cause by her prescribed medication. However, a review of the record reveals plaintiff requested a medication change in 2002 not due to side effects but due to changes in her health insurance plan. A review of the record fails to show plaintiff complained of these side effects to an examining or treating physician. *Richmond v. Shalala,* 23 F.3d 1441, 1443-1444 (8th Cir. 1994.); *Johnston v. Apfel*, 210 F.3d 870, 873 -874 (8th Cir. 2000).

With regard to plaintiff's alleged mental impairments, the record reflects very little treatment for any mental impairments. In 2004, after undergoing an intake evaluation, Dr. Rest recommended plaintiff undergo individual therapy. The record reflects plaintiff did not return to OGC again until February of 2005. Plaintiff has sought sporadic treatment for depression and

-18-

anxiety from Dr. Yawn but reported in February of 2005 that the use of Cymbalta was working and that she was not having as many crying spells. With regard to plaintiff's alleged intellectual functioning limitations, the only evidence of any limitation stemmed from an IQ test that was deemed by the examiner to be inaccurate due to plaintiff's malingering and pervasive lying.

The ALJ also considered plaintiff's daily activities. The ALJ noted plaintiff's report that her pain precluded her from sleeping well and doing much more than sitting in her recliner reading and watching television. However, the ALJ further noted plaintiff's report that she was able to fold laundry, lift a gallon of liquid, walk one block and sit for thirty to forty minutes. In a supplemental interview outline, plaintiff also indicated she had to sit down and rest but could take care of her personal needs, wash dishes, do some grocery shopping, do banking, prepare some meals, drive a little, watch television and read. (Tr. 88-89). Based on a review of the record, we find substantial evidence of record supporting the ALJ's determination that plaintiff's reported limited daily activities was outweighed by the record as a whole.

The ALJ also considered the testimony of plaintiff's husband. As the testimony of family members and friends need only be given consideration and need not be considered credible, the ALJ properly discredited the testimony of the witness. *Lawrence v. Chater*, 107 F.3d 674, 677 (8th Cir. 1997).

Therefore, although it is clear that plaintiff suffers with some degree of pain, she has not established that she was unable to engage in any gainful activity during the relevant time period. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (holding that, although plaintiff did have degenerative disease of the lumbar

-19-

spine, the evidence did not support a finding of disabled).   Accordingly, we conclude that

substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were

not totally credible.

### B.   RFC and Treating Physicians Opinion

Plaintiff argues the ALJ erred in giving more weight to the one-time consultative

examiners and less to plaintiff's treating physicians when he determined plaintiff's RFC.

It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's

residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469

(8th Cir. 2000).  The United States Court of Appeals for the Eighth Circuit has also stated that

a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448,

451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th

Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ

should obtain medical evidence that addresses the claimant's "ability to function in the

workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000).  Therefore, in evaluating the

plaintiff's RFC, *see* 20 C.F.R. § 404.154599(c), while not limited to considering medical

evidence, an ALJ is required to consider at least some supporting evidence from a professional.

*Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs*., 662 F.

Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question,"and medical evidence was

required to establish how claimant's heart attacks affected his RFC).

While a treating physician's opinion is generally entitled to "substantial weight," such an

opinion does not "automatically control" because the hearing examiner must evaluate the record

as a whole. *Wilson v. Apfel,* 172 F.3d 539, 542 (8th Cir.1999). "It is well established that an ALJ

may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record." *Prosch v. Apfel,* 201 F.3d 1010, 1013-14 (8th Cir.2000).  An ALJ may also give more weight to the opinion of a specialist about medical issues related to her or her area of specialty. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (holding that Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of speciality than to the opinion of a source who is not a specialist).

"When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions." *Cantrell v. Apfel,* 231 F.3d 1104, 1107 (8th Cir.2000). "As a general matter, the report of a consulting physician who examined a claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." *Id.* (internal quotations and citations omitted). However, the Eighth Circuit has made exceptions to this general rule. One such exception is when the consultative examiner's findings are supported by better or more thorough medical evidence. *Wagner v. Astrue*, 499 F.3d 842, 849-850 (8th Cir. 2007).

In the present case, the ALJ determined plaintiff maintained the RFC to perform light work that did not require stooping or crouching. With regard to nonexertional impairments, the ALJ found plaintiff was limited to only that work not precluded by the following: a more than satisfactory ability to function independently, understand, remember and carry out simple instructions and maintain personal appearance; a limited but satisfactory ability to follow work rules, use judgment, maintain attention and concentration, and understand, remember and carry out both detailed and complex instructions; a between limited but satisfactory and seriously

-21-

limited but not precluded ability to relate to co-workers, deal with the public, interact with supervisors, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability; and with a seriously limited but not precluded ability to deal with work stresses.

By determining plaintiff could perform light work with the non-exertional limitations set out above, the ALJ concluded that Dr. Yawn's opinion regarding plaintiff's ability to perform less than sedentary work inconsistent with the objective medical evidence in the record. *See Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995) (while treating physicians' opinions are ordinarily entitled to great weight, they are not conclusive and must be supported by medically acceptable clinical or diagnostic data). Specifically, the ALJ found that many of plaintiff's office visits with Dr. Yawn do not appear to be based on problems with plaintiff's back disorder, that Dr. Yawn's treatment notes are inconsistent with his assessment and that the imaging findings used by Dr. Yawn to support his opinion do not support so restrictive of an assessment.

A review of the record reveals plaintiff did seek treatment from Dr. Yawn during the relevant time period and that Dr. Yawn did prescribe medication to help relieve her back pain. The record reveals that during the relevant time period plaintiff saw Dr. Yawn on August 31, 2001, September 26, 2001, January 17, 2002, August 21, 2002, September 19, 2002, October 21, 2002, December 23, 2002, February 17, 2003, July 26, 2004, October 26. 2004, January 5, 2005 and February 2, 2005. While plaintiff did report back and left-sided pain during some of the above appointments, seven of those twelve appointments were follow-up appointments for plaintiff's hypertension, hypothyroidism and weight loss. Dr. Yawn indicated he also used MRI

-22-

studies to support his finding that plaintiff could perform less than sedentary work. However, the ALJ noted Dr. Martinson, an orthopedic physician, had also revealed those MRI's dated in 2000 and 2001, and after physically examining plaintiff opined plaintiff could still perform light work. Dr. Martinson also noted that several aspects of plaintiff's physical examination were non-physiologic and suggested symptom magnification.  Dr. Martinson also recommended a psychological evaluation based on her assessment of plaintiff having significant psychological abnormalities. The evidence of record reveals plaintiff did undergo an MRI in 2003 not mentioned by Dr. Martinson, however, the physician that reviewed the MRI opined the study revealed a suspected right hemilaminectomy defect at L4-5 with minimal disc bulge seen not resulting in any significant central or lateral recess stenosis; minimal posterior disc bulge at L3-4 and L5-S1; and no abnormal enhancement to suggest discitis or vertebral osteomyelitis.

With regard to plaintiff's mental RFC, plaintiff argues the ALJ did not properly address the mental diagnoses made by plaintiff's examining physicians at OGC. The ALJ's decision noted the psychological treatment notes from OGC and the consultative evaluation, including a medical assessment of ability to do work-related activities(mental), completed by Dr. McCarty. The ALJ noted that like Dr. Martinson, Dr. McCarty opined plaintiff was a malinger. Dr. McCarty noted plaintiff scored a Full Scale IQ of 70 on the WAIS-III but opined plaintiff was holding back and not giving her best effort. Dr. McCarty further opined plaintiff tried hard to demonstrate the severity of her reported symptoms and exhibited an exaggerated symptom presentation that appeared to earn secondary gains from her husband. Dr. McCarty noted this was further evidenced by plaintiff's MMPI-2 results revealing an invalid profile that suggested pervasive lying and malingering.

-23-

Based on the entire evidence of record, we find the ALJ properly resolved the conflicts between the physicians and that the RFC determination is supported by substantial evidence.

**D.      Allegation that plaintiff met Listing 12.05 (C):**

Plaintiff's alleges that the ALJ failed to find plaintiff disabled as she met the Listing for 12.05(C). To show a sufficiently severe disorder under subsection (C) of Listing 12.05, an applicant must show "[a] valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." *Birlew v. Astrue*, 2008 WL 2967108, 15  (E.D.Mo. 2008).  As discussed above, the Full Scale IQ score of 70 relied upon by plaintiff was found to be invalid by the examining psychologist due to plaintiff's pervasive lying and malingering.  Since there is no evidence of a valid IQ score falling into the range to meet the Listing, we find substantial evidence of record supporting the ALJ's determination that plaintiff did not meet the Listing.

**E.      Hypothetical Question:**

After thoroughly reviewing the hearing transcript along with the entire evidence of record, we find that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. *See Goff v. Barnhart,* 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, we find that the vocational expert's interrogatory responses constitute substantial evidence supporting the ALJ's conclusion that plaintiff's impairments do not preclude her from performing other work as a production worker, a call out operator and a charge account clerk. *Pickney v. Chater*, 96 F.3d 294, 296 (8th

AO72A
(Rev. 8/82)

Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### F.   Fully and Fairly Develop the Record:

Finally, we reject plaintiff's contention that the ALJ failed to fully and fairly develop the record. While an ALJ is required to develop the record fully and fairly even when a claimant has an attorney, *See Freeman v. Apfel,* 208 F.3d 687, 692 (8th Cir.2000) (ALJ only must order consultative examination when it is necessary for an informed decision), the record before the ALJ contained the evidence required to make a full and informed decision regarding plaintiff's capabilities during the relevant time period. *See Strongson v. Barnhart,* 361 F.3d 1066, 1071-72 (8th Cir.2004) (ALJ must develop record fully and fairly to ensure it includes evidence from treating physician, or at least examining physician, addressing impairments at issue).

### V.   Conclusion:

Based on the foregoing, we recommend affirming the ALJ's decision and dismissing plaintiff's case with prejudice. **The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 10th day of September 2008.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-25-